## DAVID BINGHAM ET AL. *v.* DEPARTMENT OF PUBLIC WORKS ET AL.*

Superior Court, Judicial District of Hartford
File No. CV-09-4042554-S

* Affirmed. *Bingham* v. *Dept. of Public Works*, 127 Conn. App. 461, 15 A.3d 213 (2011).

Memorandum filed November 12, 2009

*David Bingham*, pro se, and *Robert Fromer*, pro se, the plaintiffs.

*John C. King, David J. Monz* and *Eileen P. Conneely*, for the named defendant.

*Charles L. Howard* and *Amber N. Sarno*, for the defendant town of Preston.

SHELDON, J. This action concerns the sale and transfer, by the defendant State of Connecticut Department of Public Works ("DPW") to the defendant Town of Preston, Connecticut ("Town"), of a parcel of real property ("the subject property") within the Town on which the State of Connecticut Department of Mental Health ("DMH") formerly operated part of the Norwich State Hospital ("Hospital"). The action was brought against the defendants by two Connecticut residents, plaintiffs David Bingham and Robert Fromer, to obtain declaratory and injunctive relief against the defendants pursuant to General Statutes §§ 22a-16 and 22a-20, parts of the Connecticut Environmental Policy Act ("the Environmental Policy Act" or "CEPA"), in order to prevent what they claim to be the reasonable likelihood of unreasonable pollution, impairment or destruction of the air, water or other natural resources of this State resulting from the sale and transfer.

The defendants have now filed separate Motions to Dismiss this action for lack of subject matter jurisdiction on three related grounds, all attacking the justiciability of the plaintiffs' present claims. They assert, more

particularly: (1) that the plaintiffs lack standing to prosecute those claims on any cognizable legal theory; (2) that the claims are moot because the subject property has already been transferred to the Town; and (3) that, because such claims are admittedly based upon the possibility that "indeterminate" future development of the subject property may one day cause unreasonable environmental harm, they are not yet ripe for adjudication. The defendants have supported their Motions to Dismiss with separate memoranda of law and a joint reply brief, and the plaintiffs have opposed the Motions with a joint memorandum in opposition and a joint surreply brief. The Motions were argued before this Court on July 20, 2009.

I

## FACTUAL AND LEGAL INTRODUCTION

"[J]usticiability comprises several related doctrines, namely, standing, ripeness, [and] mootness . . . that implicate a court's subject matter jurisdiction and its competency to adjudicate a particular matter." (Internal quotation marks omitted.) *Chapman Lumber, Inc.* v. *Tager*, 288 Conn. 69, 86, 952 A.2d 1 (2008). "Jurisdiction of the subject-matter is the power [of the court] to hear and determine cases of the general class to which the proceedings in question belong. . . . A court has subject matter jurisdiction if it has the authority to adjudicate a particular type of legal controversy. . . . [O]nce the question of lack of jurisdiction of a court is raised, [it] must be disposed of no matter in what form it is presented . . . and the court must fully resolve it before proceeding further with the case." (Internal quotation marks omitted.) *Milford Power Co., LLC* v. *Alstom Power, Inc.*, 263 Conn. 616, 624–25, 822 A.2d 196 (2003). Accordingly, "[a] case that is nonjusticiable must be dismissed for lack of subject matter jurisdiction." (Internal quotation marks omitted.) *Chapman Lumber, Inc.* v. *Tager*, supra, 86.

"[T]he plaintiff bears the burden of proving subject matter jurisdiction, whenever and however raised." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC* v. *New London*, 265 Conn. 423, 430 n.12, 829 A.2d 801 (2003) (*New London I*). Nevertheless, "[w]hen a [trial] court decides a jurisdictional question raised by a pretrial motion to dismiss, it must consider the allegations of the complaint in their most favorable light. . . . In this regard, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader." (Internal quotation marks omitted.) *State* v. *Marsh & McLennan Cos.*, 286 Conn. 454, 464, 944 A.2d 315 (2008).

In their four count Amended Verified Complaint dated March 18, 2009 ("Complaint"),[1] the plaintiffs have pleaded the following facts. In 1996, DMH ceased operating the Norwich State Hospital on a site ("the site" or "the NSH site") comprised of the subject property in the Town of Preston and an adjacent property in the City of Norwich,[2] which is not at issue in this case. When it did so, DMH duly notified the State Office of Policy and Management ("OPM") that it would no longer use the site, whereafter OPM deemed the site to be "surplus" due to its negative property value[3] and so notified the Commissioner of Public Works ("Commissioner") pursuant to General Statutes § 4b-21 (c). Thereafter, in September of 2004, before offering the site for sale to the public, the Commissioner offered to sell those portions of it which are located within the Town of Preston and the City of Norwich to the Town

---

[1] The Amended Verified Complaint is the operative complaint, and thus any references to "the Complaint" are to that pleading.

[2] Part of the property is located in the city of Norwich; however, that portion is not at issue for purposes of this motion.

[3] The plaintiffs allege that the NSH site has a negative property value due to the projected cost of remediating existing contamination on the site. Complaint, paragraph 19 c.

and the City, respectively, as required by General Statutes §§ 3-14b and 4b-21 (c). The Town accepted the Commissioner's offer on October 13, 2004, by giving written notification of its desire to purchase the subject property.

In April of 2005, the plaintiffs filed a petition with the Commissioner of Public Works to obtain a declaratory ruling that the sale and transfer of the subject property was subject to the Environmental Policy Act, General Statutes § 22a-1 et seq. The plaintiffs sought in their petition, as later amended, to obtain several specific determinations as to the nature and extent of the State's legal obligations in connection with the proposed sale and transfer, including: whether the State is obligated by the Connecticut General Statutes, chapter 439, or the Regulations of Connecticut State Agencies ("RCSA"), § 22a-1a-1, to prepare an Environmental Classification Document ("ECD"), an Environmental Assessment ("EA") and/or an Environmental Impact Evaluation ("EIE") with respect to State property before transferring title to the property; whether the action of a State agency in selling surplus property to a Town is a "ministerial action involving no exercise of discretion," and thus exempt from the application of the Environmental Policy Act; whether the sale or exchange of the subject property constitutes a financial or financial assistance grant to the Town equal in monetary value to the appraised or fair market value of the property for commercial purposes; and whether the sale or exchange of the subject property constitutes an action which may significantly affect the environment, as defined in General Statutes § 22a-1c.

In his Declaratory Ruling, the Commissioner ruled, *inter alia*, as follows: there is nothing in the General Statutes, chapter 439 or the RCSA, § 22a-1a-1, which obligates the State to prepare an ECD, an EA or an EIE prior to the sale and transfer of State property such

as the subject property, and thus no such document, analysis or evaluation was required before the subject property could be sold and transferred as proposed; the transfer of the subject property to the Town pursuant to §§ 3-14b and 4b-21 (c) is ministerial in nature, involving no exercise of discretion whatsoever, and thus it is exempt from the Environmental Policy Act under § 22a-1c; and the sale and transfer of surplus property to the Town does not constitute an action significantly affecting the environment, for the mere transfer of title is separate and distinct from whatever development of the property the Town may eventually permit or undertake.[4] The plaintiffs appealed from the Commissioner's Declaratory Ruling to the Superior Court,

[4] General Statutes § 22a-1b (c) provides: "Each state department, institution or agency responsible for the primary recommendation or initiation of actions which may significantly affect the environment shall in the case of each such proposed action make a detailed written evaluation of its environmental impact before deciding whether to undertake or approve such action. All such environmental impact evaluations shall be detailed statements setting forth the following: (1) A description of the proposed action which shall include, but not be limited to, a description of the purpose and need of the proposed action, and, in the case of a proposed facility, a description of the infrastructure needs of such facility, including, but not limited to, parking, water supply, wastewater treatment and the square footage of the facility; (2) the environmental consequences of the proposed action, including cumulative, direct and indirect effects which might result during and subsequent to the proposed action; (3) any adverse environmental effects which cannot be avoided and irreversible and irretrievable commitments of resources should the proposal be implemented; (4) alternatives to the proposed action, including the alternative of not proceeding with the proposed action and, in the case of a proposed facility, a list of all the sites controlled by or reasonably available to the sponsoring agency that would meet the stated purpose of such facility; (5) an evaluation of the proposed action's consistency and each alternative's consistency with the state plan of conservation and development, an evaluation of each alternative including, to the extent practicable, whether it avoids, minimizes or mitigates environmental impacts, and, where appropriate, a description of detailed mitigation measures proposed to minimize environmental impacts, including, but not limited to, where appropriate, a site plan; (6) an analysis of the short term and long term economic, social and environmental costs and benefits of the proposed action; (7) the effect of the proposed action on the use and conservation of energy resources; and (8) a description of the

which dismissed the appeal for lack of standing because the plaintiffs were not aggrieved by the challenged sale and transfer, as required by the Uniform Administrative Procedure Act ("UAPA"), General Statutes § 4-166 et seq. That decision was later affirmed by the Connecticut Supreme Court, without reaching the merits of the plaintiffs' underlying claims, in *Bingham* v. *Dept. of Public Works*, 286 Conn. 698, 945 A.2d 927 (2008).

The Complaint further alleges that on March 13, 2009, the Town of Preston purchased and closed on the sale of the subject property from the DPW for the price of $1.00.[5] The purchase and sale agreement prohibited the use of the property for: (1) casino style gaming; (2) the operation of a racetrack; (3) an airport or heliport; or (4) a landfill, garbage, refuse depository, or storage area for solid or hazardous waste of any kind. The agreement was virtually silent, however, as to any environmental restrictions upon the property's future use.[6]

---

effects of the proposed action on sacred sites or archaeological sites of state or national importance. In the case of an action which affects existing housing, the evaluation shall also contain a detailed statement analyzing (A) housing consequences of the proposed action, including direct and indirect effects which might result during and subsequent to the proposed action by income group as defined in section 8-37aa and by race, and (B) the consistency of the housing consequences with the long-range state housing plan adopted under section 8-37t. As used in this section, 'sacred sites' and 'archaeological sites' shall have the same meaning as in section 10-381."

[5] The plaintiffs' original complaint, which was filed prior to the closing of the hospital property, sought declaratory and injunctive relief to prevent the sale and transfer of the hospital property to the town of Preston without the completion of an EIE. The property was, however, sold and transferred to the town of Preston before the claim for temporary injunctive relief was heard by the court.

[6] The complaint states: "The [department] conducted a Phase I and Phase II environmental assessment of the property, which indicated that the property is an Establishment as defined under the Connecticut Transfer Act, [General Statutes] § 22a-134 et seq. . . and which also indicate[d] the presence of certain environmental conditions on the property contained in the 'Environmental Reports.' This is the only environmental matter present in the [a]greement."

The plaintiffs go on to claim that the transfer of the subject property to the Town: (1) will result in "intended indeterminate future development of the property" that may significantly affect the local environment on and off the property; (2) constitutes a *per se* violation of the Environmental Policy Act because it was consummated without the preparation of an EIE; (3) presents a reasonable likelihood of causing unreasonable environmental harm to the local air, soil and water resources, including the Thames River; and (4) results in unjust enrichment of the Town because it allegedly constitutes a financial grant. Accordingly, in their prayer for relief, the plaintiffs seek, *inter alia*, a declaratory ruling that DPW was required to perform an EIE prior to the sale and transfer of the property, in accordance with General Statutes § 22a-1b, plus several listed types of temporary and permanent injunctive relief. As temporary injunctive relief, they seek orders: (1) enjoining the sale and transfer of the property until DPW performs an EIE; (2) requiring DPW to perform an EIE with respect to such sale and transfer; (3) voiding the agreement between DPW and the Town for the sale and transfer of the property; (4) enjoining the unjust enrichment of the Town by the consummation of the challenged sale and transfer; and (5) granting the plaintiffs and their experts full access to the property. As permanent injunctive relief, the plaintiffs seek orders: (1) requiring the DPW to comply with the Environmental Policy Act; and (2) granting them such other relief as the Court deems necessary to protect the public trust in the State's natural resources from the likelihood of unreasonable pollution, impairment or destruction, under General Statutes § 22a-18 (a).[7]

---

[7] General Statutes § 22a-18 (a) provides: "The court may grant temporary and permanent equitable relief, or may impose such conditions on the defendant as are required to protect the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction."

II

## CHALLENGE TO RIPENESS OF PLAINTIFFS' CLAIMS

The purpose of the ripeness requirement is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . ." (Citation omitted; internal quotation marks omitted.) *Milford Power Co., LLC* v. *Alstom Power, Inc.*, supra, 263 Conn. 626. "[The court] must be satisfied that the case before [it] does not present a hypothetical injury or a claim contingent upon some event that has not and indeed may never transpire." Id.

General Statutes § 22a-16 allows "any person" to maintain an action in the Superior Court "for declaratory and equitable relief . . . for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction . . . ." General Statutes § 22a-17 (a)[8] sets forth as follows the requirements for proving a claim under § 22a-16: "When the plaintiff in any such action has made a prima facie showing that the conduct of the defendant, acting alone, or in combination with others, has, or is *reasonably likely* unreasonably to pollute, impair or destroy the public trust in the air, water or other natural resources of the state, the defendant may rebut the prima facie showing by the submission of evidence to the contrary. . . ." (Emphasis added.) The plain language of § 22a-17 (a) indicates that § 22a-16 is intended to permit plaintiffs to challenge both conduct that has unreasonably damaged natural

---

[8] General Statutes § 22a-17 (a) provides in relevant part: "When the plaintiff in any such action has made a prima facie showing that the conduct of the defendant, acting alone, or in combination with others, has, or is *reasonably likely* unreasonably to pollute, impair or destroy the public trust in the air, water or other natural resources of the state, the defendant may rebut the prima facie showing by the submission of evidence to the contrary. . . ." (Emphasis added.)

resources in the past and conduct that is reasonably likely to do so in the future. See *Fort Trumbull Conservancy, LLC* v. *New London,* 282 Conn. 791, 807, 925 A.2d 292 (2007) (*New London II*) ("[n]othing in [our prior case law] was intended to suggest that a plaintiff cannot challenge an official plan to engage in conduct that allegedly will result in unreasonable pollution under § 22a-16 before the harm actually occurs").

Notwithstanding a plaintiff's statutory right under § 22a-16 to challenge conduct that is reasonably likely to harm the environment in the future, the ripeness requirement makes it clear that an action cannot be prosecuted unless and until an actual issue is in dispute between the parties. "In other words, [if] the plaintiff's claims [are] contingent on the outcome of a dispute that [has] not yet transpired, and indeed might never transpire, the injury [is] hypothetical and, therefore, the claim [is] not justiciable." *Milford Power Co., LLC* v. *Alstom Power, Inc.,* supra, 263 Conn. 627. Applying this rule in the case before it, the Court in *Milford Power Co., LLC* v. *Alstom Power, Inc.,* supra, 616, held that the claim at issue was not ripe because "there was no *actual* issue in dispute. The plaintiff sought a declaratory judgment, not to settle a present controversy, but rather to avoid one in the future. Conduct by the defendants that could form the foundation for a real controversy between the parties, over additional time . . . had not moved beyond the theoretical. Because this declaratory judgment action was not predicated on a justiciable controversy, the trial court did not have jurisdiction over the matter." (Emphasis in original.) Id., 629.

Claims premised on future events may of course be justiciable, despite their contingent nature, where the events, though contingent, are inevitable. *May* v. *Lantz,* Superior Court, judicial district of Hartford, Docket No. CV-03-0829408-S (May 10, 2004) (*Berger, J.*) (37 Conn.

L. Rptr. 7) (holding that the plaintiff's action for declaratory judgment as to whether he would be required to register as sex offender when his sentence expired was ripe for adjudication, and thus "distinguishable from *Milford Power* [*Co., LLC*] because it pertain[ed] to a situation in which the outcome [was] not merely theoretical or hypothetical, but, due to the [offender's] actions, inevitable"). Indeed, even when the occurrence of such future events, though not inevitable, is reasonably likely, such a reasonable likelihood is typically sufficient to transform a merely theoretical, nonjusticiable controversy into an actual, justiciable dispute which is ripe for adjudication. See, e.g., *George* v. *Watertown*, 85 Conn. App. 606, 613, 858 A.2d 800 (holding that the plaintiff's action for declaratory judgment as to the constitutionality of a subdivision regulation was ripe, although the plaintiff did not have an application pending and the planning and zoning commission was not presently attempting to enforce the challenged regulation against him, where the commission had enforced the regulation in the past, and thus was likely to do so in the future), cert. denied, 272 Conn. 911, 863 A.2d 702 (2004). Consistent with these authorities, the Court in *Friends of Animals, Inc.* v. *United Illuminating Co.*, Superior Court, judicial district of New Haven, Docket No. CV-06-4018257 (September 20, 2006) (*Hon. David W. Skolnick*, judge trial referee), found that the plaintiff's claim of harm to the environment under § 22a-16 was ripe for adjudication because, as alleged, the defendant's current activities made the harm sought to be avoided—the capturing and killing of monk parakeets—reasonably likely to occur in the future. Although at the time of trial the defendant was not engaged in such capturing and killing activities, the Complaint contained allegations that the birds were presently building their nests on the defendants' utility poles and that the defendant's ongoing maintenance

program, which was not designed to prevent the birds from continuing to do so, would likely lead the defendant to resume catching and killing them. Thus, the defendant's plan, which was in place at the time of trial, was held to present the Court with an actual controversy, ripe for adjudication, as to whether its conduct thereunder was reasonably likely to harm the birds, and thus the natural resources of the State, in the future.

In order to square the concept of ripeness with the Court's authority under § 22a-16 to afford declaratory and injunctive relief to plaintiffs challenging conduct claimed reasonably likely to harm the environment in the future upon the occurrence of contingent future events, the plaintiff must plead that the occurrence of such contingent future events itself is reasonably likely to occur. Where, then, the contingent future event allegedly threatening to cause unreasonable harm to the environment is development, an official plan of development must at least be proposed, if not finally adopted and put in motion. Cf. *New London II*, supra, 282 Conn. 809–10 (under § 22a-16, a claim is ripe where there is an official plan in place to engage in conduct that allegedly will result in unreasonable harm to the environment).[9] Only then can the challenged transfer of the subject property be found reasonably likely to cause unreasonable harm to the environment. In the end, although a plaintiff need not wait until development has actually begun to make his challenge, the plaintiff's claim must be dismissed for lack of ripeness if it is brought prior to the adoption or proposal of such a plan.

Against this background, the defendants here argue that the Complaint must be dismissed because the plaintiffs' claim is not yet ripe for adjudication. Specifically,

[9] This interpretation is also consistent with the very substance of the statute the plaintiffs seek to enforce, General Statutes § 22a-1b (c), which, as discussed in part III A of this Memorandum of Decision, requires an EIE when there is a "recommendation or initiation of actions which may significantly affect the environment . . . ."

they argue that since development of the subject property has not yet occurred, and no specific plan of development has yet been proposed, any injury to the environment that might one day arise from its development is purely theoretical, for it may never occur. In support of this argument, the defendants point to portions of the Complaint where the plaintiffs allege that "indeterminate actions," contingent on the future development of the property, may at some future time have an adverse effect on the environment. By their use of these words in their pleadings, the plaintiffs candidly concede that the shape and substance of such future development is not now known or knowable, and thus its probable impact on the environment cannot now be assessed. Claims based upon such theoretical possibilities are not ripe for adjudication.

The defendants finally argue that, as implicitly recognized by the Supreme Court in affirming the dismissal of the plaintiffs' previous administrative appeal, the proper time for them to assert claims for relief under the Environmental Policy Act to forestall the adverse environmental consequences of future development of the subject property will be when a plan for the development of the property is finally proposed or adopted.[10] Only then, they claim, will an actual dispute arise as to the nature and substance of the proposed development and its potentially damaging environmental consequences, and thus only then will the issues here presented become ripe for adjudication. For all of these

---

[10] In affirming the trial court's dismissal, the Supreme Court stated: "We note that, although the trial court properly dismissed the plaintiffs' appeal under the UAPA, the plaintiffs have alternate routes to raise their environmental concerns under the [state Environmental Protection Act of 1971, General Statutes § 22a-14 et seq.]. First, under [General Statutes] § 22a-19 (a), the plaintiffs can intervene in and raise environmental issues in any municipal administrative proceeding for permits and approvals needed to develop the hospital property. Second, the plaintiffs could bring an independent action under § 22a-16 to challenge any *development* of the hospital property on environmental grounds." (Emphasis added.) *Bingham* v. *Dept. of Public Works*, supra, 286 Conn. 707 n.7.

reasons, the defendants claim that the Complaint must be dismissed for lack of subject matter jurisdiction on the ground of ripeness.

The plaintiffs attempt to counter the foregoing arguments in two ways. First, they contend that the subject property will one day be developed by the Town, under a mandatory plan of development which the Town will one day adopt, and thus the environmental impact of the transfer, which makes the adoption of such a plan for development inevitable, can and should be assessed and adjudicated at this time. Despite this claim, however, the plaintiffs have not pleaded and cannot yet describe any official plans or proposals for development.[11] Thus, to reiterate, the only conduct pleaded by the plaintiffs is the sale and transfer of the property to the Town, which has not itself resulted in any environmental harm. Plainly, the intermediate step between the transfer of the property and any environmental harms which the plaintiffs seek to avoid is the development of the property, if it ever takes place. Because the occurrence of any alleged harm coming within the statute is therefore dependent on such contingent future events which have not been planned or proposed and may never occur, the matter is not ripe for adjudication.

The plaintiffs also argue that "[w]aiting until the plan is in place instead of using the EIE at the earliest stages to provide the underlying factual information for preventive planning defeats the very purpose of the [Environmental] [P]olicy [A]ct," which is to "ensure

_____

[11] In their opposing memorandum of law, the plaintiffs claim that "the [s]tate, the [s]outheastern Connecticut [c]ouncil of [g]overnments . . . (regional planning agency) and the [town of Preston] have already adopted macroscopic plans of conservation and development . . . ." Nevertheless, the plaintiffs have not pleaded this in their complaint. Furthermore, even if they had, such an allegation would be insufficient to satisfy their burden of proof, which requires an official plan or proposal instead of a mere speculation that such plans are forthcoming.

systematic consideration of environmental risks at the early stages of planning before the state . . . [commits its] resources to the particular use of a site . . . ." (Internal quotation marks omitted.) As explained above, however, the ripeness requirement does not require the plaintiffs to wait until development is in full force to challenge its potentially adverse environmental consequences. It simply requires the plaintiffs to wait before presenting their claims until some specific type of development is at least proposed so that its potentially adverse effects on the environment can appropriately be identified and assessed.

For the foregoing reasons, the defendants' Motions to Dismiss must be granted because the plaintiffs' claims are not yet ripe for adjudication.

### III

### CHALLENGE TO PLAINTIFFS' STANDING

"If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause." (Internal quotation marks omitted.) *Andross* v. *West Hartford*, 285 Conn. 309, 321, 939 A.2d 1146 (2008). "Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of direct injury he has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy. . . . The requirement of directness between the injuries claimed

by the plaintiff and the conduct of the defendant also is expressed, in our standing jurisprudence, by the focus on whether the plaintiff is the proper party to assert the claim at issue." (Internal quotation marks omitted.) *New London II,* supra, 282 Conn. 802–803. A plaintiff may establish standing by proving either: (1) statutory aggrievement; (2) classical aggrievement; or (3) taxpayer standing. *Andross* v. *West Harford,* supra, 322–23.

In this case, both plaintiffs claim that they have standing to bring this action based on (1) statutory aggrievement under § 22a-16[12] and (2) their status as State taxpayers. In addition, plaintiff Bingham claims that he has standing based on classical aggrievement because his forebears are buried in the historic Brewster Cemetery, which is adjacent to the subject property.

A

Plaintiffs' Claims of Statutory Aggrievement

"Statutory aggrievement exists by legislative fiat, not by judicial analysis of the particular facts of the case. In other words, in cases of statutory aggrievement, particular legislation grants standing to those who claim injury to an interest protected by that legislation." (Internal quotation marks omitted.) *New London II* supra, 282 Conn. 803. In particular, "under § 22a-16, any private party . . . without first having to establish [classical] aggrievement, may seek injunctive relief in court for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction . . . ." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC* v. *Alves,* 262 Conn. 480, 495,

---

[12] The plaintiff also claims statutory standing based on General Statutes §§ 22a-15 and 22a-20. These sections, however, do not confer standing. See *Burton* v. *Commissioner of Environmental Protection,* 291 Conn. 789, 799, 970 A.2d 640 (2009).

815 A.2d 1188 (2003). There is "no restriction on the class of persons with standing to seek relief under § 22a-16." (Internal quotation marks omitted.) *New London II,* supra, 804.

"It is settled that the existence of statutory standing depends on whether the interest sought to be protected by the [plaintiff] is arguably within the zone of interests to be protected or regulated by the statute . . . . Under § 22a-16, standing . . . is conferred only to protect the natural resources of the state from pollution or destruction. . . . Accordingly, all that is required to invoke the jurisdiction of the Superior Court under § 22a-16 is a colorable claim . . . against any person . . . of conduct resulting in harm to one or more of the natural resources of this state. . . . Although it is true, of course, that the plaintiff need not prove its case at this stage of the proceedings . . . the plaintiff nevertheless must articulate a colorable claim of unreasonable pollution, impairment or destruction of the environment. . . . A complaint does not sufficiently allege standing [however] by merely reciting the provisions of § 22a-16, but must set forth facts to support an inference that unreasonable pollution, impairment or destruction of a natural resource will probably result from the challenged activities unless remedial measures are taken." (Citation omitted; internal quotation marks omitted.) Id., 804–805.

The defendants here argue that the plaintiffs have not established standing based on statutory aggrievement under § 22a-16 because they have not alleged conduct that will result in harm to the natural resources of the State. Instead, they argue, the only conduct alleged by the plaintiffs is the sale and transfer of the subject property from the DPW to the Town, which does not, in and of itself, result in harm to natural resources. Furthermore, the defendants argue that even if the sale

and transfer of the property could somehow be considered conduct that will unreasonably impact the natural resources of the State, the plaintiffs have failed to make that allegation in their Complaint. To the contrary, they claim, all possible environmental harm allegedly resulting from the sale and transfer is contingent on the speculative future development of the property. On that basis, the defendants claim that the plaintiffs have failed to plead that their only alleged conduct—the sale and transfer of the subject property, as opposed to its potential future development—is likely to cause unreasonable harm to the environment.

The plaintiffs' first argument in support of their claim of statutory aggrievement is that the Complaint sufficiently alleges standing by pleading that there are now and will be mandatory plans for the development of the property. As explained in part II of this Memorandum of Decision, however, the Complaint sets forth no allegations of proposed or adopted plans for such future development. As such, the plaintiffs cannot claim standing under § 22a-16 on that basis.

The plaintiffs next argue that they have sufficiently alleged standing by pleading that the transfer of the property itself will result in unreasonable harm. This argument fails, however, because the plaintiffs have not set forth any facts to support an inference that unreasonable destruction to the environment will probably result from the transfer itself unless remedial measures are taken. As explained above, "[a] complaint does not sufficiently allege standing . . . by merely reciting the provisions of § 22a-16 . . . ." (Internal quotation marks omitted.) Id., 804. Instead, it "must set forth facts to support an inference that unreasonable pollution, impairment or destruction of a natural resource will probably result from the challenged activities unless remedial measures are taken." (Internal quotation marks omitted.) Id., 804–805. In the present case,

it is not evident from the Complaint how the transfer itself, without more, could conceivably cause any form of environmental harm, and the Court is not free to "speculate about how the actions of the defendants purportedly confer standing on the plaintiff under § 22a-16." *New London I*, supra, 265 Conn. 433.

The plaintiffs' next argument is that they have sufficiently established their standing under § 22a-16 by alleging that the defendants have committed a per se violation of the Environmental Policy Act. "The standing conferred by the [Environmental Policy Act] is for the limited purpose of raising environmental issues. . . . An allegation of failure to comply with the [Act] is clearly an environmental issue." (Citation omitted.) *Manchester Environmental Coalition* v. *Stockton*, 184 Conn. 51, 66, 441 A.2d 68 (1981), overruled in part on other grounds by *Waterbury* v. *Washington*, 260 Conn. 506, 556, 800 A.2d 1102 (2002). Although a plaintiff is not required to prove a violation of the Act to establish standing, he nevertheless must set forth sufficient facts to support an inference that a violation of the Act has occurred.

Section 22a-1b (c) requires that an EIE be performed whenever there is a "recommendation or initiation of *actions which may significantly affect the environment* . . . ." (Emphasis added.) Section 22a-1c defines " 'actions which may significantly affect the environment' " as "individual activities or a sequence of *planned* activities proposed to be undertaken . . . ." (Emphasis added.) Thus, at a minimum, in order to trigger the requirement of an EIE under § 22a-1b (c), there must at least be a proposal for such a planned activity.

The foregoing interpretation of the Environmental Policy Act is consistent with that of the Attorney General. In 2006, the Attorney General was asked whether

transfers of surplus State property to municipalities, pursuant to § 3-14b, implicate the provisions of the Environmental Policy Act. See Opinions, Conn. Atty. Gen. No. 06-021 (August 18, 2006). The Attorney General responded that, "[w]here a state agency transfers land to a municipality with a requirement that the property will be utilized for a specific purpose different than its existing use, such as, for example, construction of a highway or a building, then [the Environmental Policy Act] applies. In that circumstance, the agency making the transfer must determine whether the intended use of the property may significantly affect the environment. When the State changes the use, a determination must be made under [the Act] whether that use 'could have a major impact' upon the State's environmental resources. On the other hand, when an agency transfers land for continued use in its present purpose, [the Act] is not implicated. In those circumstances, *the transfer of title to the land is not an action which may significantly affect the environment, as the mere transfer of title alone has no environmental impact.*" (Emphasis added.) Id. Thus, the transfer of land to a municipality pursuant to § 3-14b only implicates the Environmental Policy Act when, at the time of the transfer, there is a plan in place to change the land's existing use.

In the present case, the plaintiffs have not set forth sufficient facts to establish a per se violation of § 22a-1b (c). In particular, the plaintiffs have not alleged any "actions which may significantly affect the environment" that would trigger a violation of § 22a-1b (c). Specifically, the plaintiffs have failed to allege that the transfer was made with any proposal of planned activity in the works. Accordingly, the plaintiffs have not set forth a colorable claim of unreasonable pollution, impairment or destruction of the environment required to establish statutory standing.

The plaintiffs' second basis for claiming statutory standing based on a per se violation of the Environmental Policy Act arises under General Statutes §§ 22a-1 and 22a-1a. Based on these provisions, the plaintiffs claim that the State's failure to conduct an EIE prior to the sale and transfer of the subject property constitutes a violation of its fiduciary duty and "responsibility as trustee of the environment for the present and future generations." General Statutes § 22a-1. While it is true that the State has recognized its "responsibility as trustee of the environment for the present and future generations" in § 22a-1, such responsibility is not without limits. In fact, the other provisions of the Environmental Policy Act spell out the State's specific responsibilities. In particular, as explained by the Attorney General in his above-referenced Opinion, § 22a-1b (c) limits the State's responsibility to conduct an EIE before the transfer of State property to instances in which there are "action[s] which may significantly affect the environment . . . ." Opinions, Conn. Atty. Gen., supra, No. 06-021. The State is not required by the language of that statute to conduct an EIE upon the mere transfer of State surplus land to a municipality. See id.; see also *Serra* v. *Solnit*, Superior Court, judicial district of Hartford, Docket No. CV-95-553813-S (August 9, 1996) (*Hon. Robert Satter*, judge trial referee) (17 Conn. L. Rptr. 399) (holding that an environmental assessment was not required when the reconfiguration of a campus was at the conceptual stage, or when a predesign study of road work was contracted for, or when the interior of a single building was being renovated, or when a consultant was hired to advise on the demolition of buildings). Thus, the State's alleged failure to conduct an EIE prior to the transfer is not a per se violation of §§ 22a-1 and 22a-1a that would grant the plaintiffs' standing under § 22a-16.[13]

[13] The plaintiffs also argue that, pursuant to state's fiduciary duty as trustee of the environment, the purchase and sale agreement should have contained protections, including an EIE requirement, to assure that best practices are

## B

## Plaintiff Bingham's Claim of Classical Aggrievement

"The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: [F]irst, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in [the challenged action], as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by [the challenged action]. . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Internal quotation marks omitted.) *West Farms Mall, LLC* v. *West Hartford*, 279 Conn. 1, 25, 901 A.2d 649 (2006).

The defendants argue that plaintiff Bingham has not established classical aggrievement because: (1) Bingham does not have a legal interest in the cemetery; and (2) even if Bingham does have a legal interest in

followed in protecting the resources of the state if and when development occurs. Once again, the plaintiffs are making an argument based on what they think the law, or the agreement, *should* require, not what it does require. As such, it is an issue for the legislature and not for this court.

The plaintiffs' last argument that the state violated its fiduciary duty claims that as a preventative environmental planning measure, the state could, and should, begin preparing an EIE by characterizing the existing environment of the property now before any development plan is adopted. In addition to the reasons articulated above, the regulations themselves support waiting until there is proposed conduct to prepare an EIE. Specifically, § 22a-1a-7 (b) of the Regulations of Connecticut State Agencies provides: "An environmental impact evaluation shall be prepared as close as possible to the time an agency *proposes an action* . . . ." (Emphasis added.) Thus, the regulations contemplate that the proposal of an action triggers the clock to start running on the preparation of an EIE. Since there is no proposed action at this time, preparation of the EIE at this moment would be inconsistent with § 22a-1a-7 (b).

the cemetery, the transfer of the property does not specifically and injuriously affect his legal interest.

The plaintiffs argue that plaintiff Bingham is classically aggrieved because he has a specific, personal and legal interest in the cemetery of his forebears, which is adjacent to the subject property, because the transfer of the property to the Town increases the likelihood of adverse environmental effects to the cemetery. Additionally, the plaintiffs argue that the transfer of the property increases the likelihood that the Town would seek to take the cemetery for purposes of development associated with the property.

The plaintiffs' claim for classical aggrievement as to Bingham does not pass the first prong because although he may have a specific, personal interest in the cemetery of his forebears, he has not cited any authority that would give him a *legal* interest in the cemetery. In addition, the allegations of the Complaint support the proposition that Bingham's interest in the cemetery is no different than that of the general public. Specifically, the Complaint states: "Failure to protect the Brewster cemetery from changes on the surrounding property which would detract from its peaceful, quiet and solemn atmosphere would be a grievous injury to the descendants of Jonathan and Lucretia Brewster, but also *to all those who care about the historical significance of this site.*" (Emphasis added.) As such, the plaintiffs have failed to plead a sufficient legal interest in the cemetery on the part of plaintiff Bingham to establish classical aggrievement arising from damage to the cemetery by reason of the sale of the subject property.

C

Plaintiffs' Claim of Taxpayer Standing

The defendants argue that the complaint is insufficient to establish the plaintiffs' standing as taxpayers

because there are no allegations that the plaintiffs are taxpayers of the Town of Preston or that their taxes have been directly or indirectly increased by the sale and transfer of the property. Furthermore, there are no allegations that the sale and transfer caused them to suffer some pecuniary or other great injury in their capacity as taxpayers. Instead, the plaintiffs only claim that they are taxpayers of the state of Connecticut and that their taxpayer dollars have contributed to the sale and transfer of the property, which is insufficient to establish taxpayer standing.

The plaintiffs argue that they have standing as taxpayers in this action because they are taxpayers of the State of Connecticut, and the transfer of the subject property to the Town of Preston constituted a grant from the State of Connecticut. On this score, in particular, they assert in their Complaint that "by selling the [hospital] property to the town for One Dollar ($1.00), the state will provide the town with about $51 million in a constructive grant at the closing."

The Connecticut Supreme Court has recognized that a plaintiff may establish standing as a taxpayer. *Andross* v. *West Hartford*, supra, 285 Conn. 323. Nevertheless, "[t]he plaintiff's status as a taxpayer does not automatically give [him] standing to challenge alleged improprieties in the conduct of the defendant town. . . . The plaintiff must also allege and demonstrate that the allegedly improper municipal conduct cause[d him] to suffer some pecuniary or other great injury. . . . It is not enough for the plaintiff to show that [his] tax dollars have contributed to the challenged project . . . . [T]he plaintiff must prove that the project has directly or indirectly increased [his] taxes . . . or, in some other fashion, caused [him] irreparable injury in [his] capacity as a taxpayer." (Internal quotation marks omitted.) *West Farms Mall, LLC* v. *West Hartford*, supra, 279 Conn. 13. Thus, in order to establish taxpayer standing, a plaintiff

must prove both: (1) "taxpayer status"; and (2) "conduct that has caused or will cause increased taxes or other irreparable injury . . . ." Id., 14.

Even upon considering the allegations of the Complaint in the light most favorable to the plaintiffs, however, the plaintiffs cannot be found to have pleaded the elements required to establish taxpayer standing. The Complaint is devoid of any allegations that would even suggest that the sale has directly or indirectly increased the plaintiffs' taxes or otherwise caused the plaintiffs irreparable injury in their capacity as taxpayers. At most, the plaintiffs' allegations can be read to suggest that in the future, their taxes may increase because of the transfer of the property. Such an allegation, however, is insufficient to establish taxpayer standing. See id., 15–18 (affirming trial court's holding that plaintiff could not establish taxpayer standing by showing that, in the future, its taxes would probably increase because of the project there at issue).

### D

### Conclusion

For the foregoing reasons, the defendants' Motions to Dismiss must also be granted because the plaintiffs lack standing to prosecute those claims.

### IV

### CHALLENGE TO MOOTNESS OF PLAINTIFFS' CLAIMS

"Mootness is a threshold issue that implicates subject matter jurisdiction, which imposes a duty on the court to dismiss a case if the court can no longer grant practical relief to the parties. . . . Mootness presents a circumstance wherein the issue before the court has been resolved or had lost its significance because of a change

in the condition of affairs between the parties." (Internal quotation marks omitted.) *Wilcox* v. *Ferraina*, 100 Conn. App. 541, 547, 920 A.2d 316 (2007). "The test for determining mootness is whether a judgment, if rendered, would have any practical legal effect upon an existing controversy. Thus, the central question in a mootness problem is whether a change in the circumstances that prevailed at the beginning of the litigation has forestalled the prospect for meaningful, practical, or effective relief." *Statewide Grievance Committee* v. *Burton*, 282 Conn. 1, 13, 917 A.2d 966 (2007). "[T]he test for determining mootness is not [w]hether the [plaintiff] would ultimately be granted relief . . . . The test, instead, is whether there is any practical relief this court can grant the [plaintiff]. . . . If no practical relief can be afforded to the parties, the [case] must be dismissed." (Internal quotation marks omitted.) *In re Jeremy M.*, 100 Conn. App. 436, 441–42, 918 A.2d 944, cert. denied, 282 Conn. 927, 926 A.2d 666 (2007).

Nevertheless, a claim may survive a motion to dismiss on the ground of mootness if it falls under one of the limited exceptions to the mootness doctrine. *Patterson* v. *Commissioner of Correction*, 112 Conn. App. 826, 830–35, 964 A.2d 1234 (2009). The mootness doctrine does not preclude a court from addressing an issue that would otherwise be considered moot if it is "capable of repetition, yet evading review" or has "collateral consequences." See id.

The defendants here argue that the plaintiffs' claims are moot and that no exception to the mootness doctrine applies. Specifically, the defendants argue that the plaintiffs' request for a declaratory ruling that the DPW is required to conduct an EIE prior to the sale and transfer of the subject property is moot because the DPW no longer has control of the property. Furthermore, they assert that the injunctive relief requested by the plaintiffs is moot because the sale and transfer

has already occurred and there is no basis for the Court to void the sale.

Although the plaintiffs do not dispute that the subject property has already been sold, they maintain that the Court may retain jurisdiction over their claims because they satisfy both exceptions to the mootness doctrine.

A

The "Capable of Repetition, Yet Evading Review" Exception

"To qualify for review under [the 'capable of repetition, yet evading review'] exception, an otherwise moot question must meet three requirements. First, the challenged action, or the effect of the challenged action, by its very nature must be of a limited duration so that there is a strong likelihood that the substantial majority of cases raising a question about its validity will become moot before appellate litigation can be concluded. Second, there must be a reasonable likelihood that the question presented in the pending case will arise again in the future, and that it will affect either the same complaining party or a reasonably identifiable group for whom that party can be said to act as surrogate. Third, the question must have some public importance. Unless all three requirements are met, the appeal must be dismissed as moot." (Internal quotation marks omitted.) *Collins* v. *Collins*, 117 Conn. App. 380, 387, 979 A.2d 543 (2009).

"The first element in the analysis pertains to the length of the challenged action. . . . The basis for this element derives from the nature of the exception. If an action or its effects is not of inherently limited duration, the action can be reviewed the next time it arises, when it will present an ongoing live controversy. Moreover, if the question presented is not strongly likely to become moot in the substantial majority of cases in which it

arises, the urgency of deciding the pending case is significantly reduced. . . . [A] party typically satisfies this prong if there exists a functionally insurmountable time [constraint] . . . or the challenged action had an intrinsically limited lifespan." (Citations omitted; internal quotation marks omitted.) Id., 388.

Our case law illustrates that in order to satisfy this first element, the action must have an inherently strict time constraint. "Paradigmatic examples are abortion cases and other medical treatment disputes." *Wallingford* v. *Dept. of Public Health*, 262 Conn. 758, 770 n.12, 817 A.2d 644 (2003); see, e.g., *Dutkiewicz* v. *Dutkiewicz*, 289 Conn. 362, 367–69, 957 A.2d 821 (2008) (sixty day parenting education requirement of General Statutes § 46b-69 presented functionally insurmountable time constraint); *Sweeney* v. *Sweeney*, 271 Conn. 193, 202, 856 A.2d 997 (2004) (pendente lite order was of inherently limited duration); *Stamford Hospital* v. *Vega*, 236 Conn. 646, 654–55, 674 A.2d 821 (1996) (challenge to issuance of injunction permitting nonconsensual blood transfusion will almost always become moot before appellate litigation is concluded).

The defendants argue that the "capable of repetition, yet evading review" exception does not apply in this case because: (1) the transfer of the property was a discrete act that will not arise again in the future or affect the same complaining party; and (2) the plaintiffs have not demonstrated the public importance of the mere transfer of the property.

The plaintiffs insist that they meet the first prong of the exception because "[t]he transfer of the property at closing is of short duration and subject to expiration before any appellate litigation that ensues." The very allegations of the instant Complaint, however, belie this assertion. In particular, the Complaint contains allegations that the purchase and sale of the property at issue

was first agreed to by the Town and the DPW in October of 2004, four and one-half years before the property was finally sold. According, after the plaintiffs first received actual notice that the sale was likely to occur, they had and took the time both to file a petition for a declaratory ruling with the Commissioner and to challenge that ruling in this Court and the Supreme Court. Indeed, after the Supreme Court issued its decision on May 6, 2008, the plaintiffs waited over nine months, until late February of 2009, to file this action. In light of this slow-moving chronology, the question here presented cannot be said to be "strongly likely" to become moot in the substantial majority of cases in which it arises, and thus it "can be reviewed the next time it arises, when it will present an ongoing live controversy." (Internal quotation marks omitted.) *Collins* v. *Collins*, supra, 117 Conn. App. 388. This action does not present a question involving the kinds of insurmountable time constraints required to satisfy the first element of the exception.

Because the conduct here challenged—the sale and transfer by a State agency to a municipality of a piece of State property deemed "surplus"—is not of an inherently limited duration, the "capable of repetition, yet evading review" exception is not applicable. Hence, because a party invoking that exception to the mootness doctrine must plead facts supporting all three essential elements thereof, the Court need not consider the other essential elements of the exception. See id., 387.

### B

### The "Collateral Consequences" Exception

"[U]nder [the Supreme Court's] long-standing mootness jurisprudence . . . despite developments during the pendency of [a case] that would otherwise render a claim moot, the court may retain jurisdiction when a litigant shows that there is a reasonable possibility that prejudicial collateral consequences will occur. . . .

[T]o invoke successfully the collateral consequences doctrine, the litigant must show that there is a reasonable possibility that prejudicial collateral consequences will occur. Accordingly, the litigant must establish these consequences by more than mere conjecture, but need not demonstrate that these consequences are more probable than not. This standard provides the necessary limitations on justiciability underlying the mootness doctrine itself. Whe[n] there is no direct practical relief available . . . the collateral consequences doctrine acts as a surrogate, calling for a determination whether a decision in the case can afford the litigant some practical relief in the future." (Internal quotation marks omitted.) *State* v. *McElveen*, 117 Conn. App. 486, 490, 979 A.2d 604 (2009).

"[T]he collateral consequences doctrine applies when the collateral consequences of the contested court action, such as the continuing stigma of a criminal conviction, constitute a continuing injury to the *specific litigant*, justifying the court's retention of jurisdiction over the dispute, despite the lack of any consequences flowing from the adjudication directly at issue in the appeal. . . . Thus, a live controversy continues to exist between the parties because of that continuing injury." (Citation omitted; emphasis added.) *Wallingford* v. *Dept. of Public Health*, supra, 262 Conn. 770 n.12.

"The array of collateral consequences that will preclude dismissal on mootness grounds is diverse, and includes harm to a defendant's reputation as a result of the judgment at issue. See, e.g., *Williams* v. *Ragaglia*, 261 Conn. 219, 227–31, 802 A.2d 778 (2002) (appeal from revocation of plaintiff's special study foster care license as consequence for violating foster care regulations was not rendered moot by grant to plaintiff of permanent custody of foster children at issue because of revocation's effect on her reputation and fact that revocation

could be used against her in future department of children and families proceedings if she wanted to become foster parent again); *State* v. *McElveen*, [261 Conn. 198, 212–16, 802 A.2d 74 (2002)] (appeal from conviction of violation of probation was not rendered moot by defendant's completion of his sentence because conviction could impact his reputation and ability to obtain employment or preconviction bail in future); see also *Office of the Governor* v. *Select Committee of Inquiry*, 271 Conn. 540, 549–50, 858 A.2d 709 (2004) (appeal not rendered moot by investigative committee statement that it would not enforce subpoena directly 'because of the collateral consequence of the potential for an article of impeachment on the basis, at least in part, of the governor's noncompliance with the subpoena'); *Wallingford* v. *Dept of Public Health*, supra, 262 Conn. 769–70 (appeal not rendered moot by passage of special act addressing issue in case because administrative ruling that town is 'water company' for purposes of possible construction of golf course on watershed land 'potentially subjects' town to collateral consequences of department jurisdiction and other statutory obligations)." *Putman* v. *Kennedy*, 279 Conn. 162, 169–70, 900 A.2d 1256 (2006).

The defendants here argue that the "collateral consequences" exception cannot save the plaintiffs' present claims from dismissal on the ground of mootness because no conduct is alleged that can be said to have had, or to have any reasonable likelihood of having in the future, any adverse impact on the environment, and thus there is no basis upon which the Court can find that the plaintiffs have suffered or will probably suffer cognizable collateral consequences of the sort that warrant the exercise of jurisdiction over an otherwise moot claim.

The plaintiffs disagree, arguing that the collateral consequences exception to the mootness doctrine

applies in the present case because the DPW's failure to prepare an EIE prior to the transfer of the subject property "provides for a potentially prejudicial legal disability to the State's natural resources for this case and all future sales and transfers of state property."

The Court concludes, however, that this case does not fit within the bounds of our State's prior cases recognizing reputational harm and other potential legal disabilities as collateral consequences of otherwise moot issues for two reasons. First, the plaintiffs have not established that the Court's failure to retain jurisdiction over the issue of whether an EIE was required prior to the sale is reasonably likely to result in collateral or prejudicial consequences. As explained previously, all of the consequences claimed by the plaintiffs are based on the admittedly "indeterminate" future development of the property. Second, there is no live controversy between the parties because of any continuing injury.

In short, the present claim is moot because the relief requested by the plaintiffs has become unavailable due to the prior sale of the subject property. Because the plaintiff has failed to allege sufficient facts to establish that the controversy is either capable of repetition yet evading review or is reasonably likely to produce collateral consequences that cannot be avoided unless the court retains jurisdiction, the Court lacks subject matter jurisdiction and this case must be dismissed.

V

CONCLUSION

For the foregoing reasons, the Court concludes that the defendants' Motion to Dismiss for lack of subject matter jurisdiction must be granted on all three grounds presented. The plaintiffs' challenged claims are not ripe for adjudication, the plaintiffs lack standing to prosecute them, and such claims have been rendered moot

by the sale and transfer of the subject property since this action was commenced.